Welch, J.
Stripped to its essentials, the present motion presents the issue of whether defendant Wilberto Rivera freely and voluntarily consented to the search of his automobile. The facts as I find them are as follows.
At 2:20 a.m. onAugust9, 1995, Trooper Kelly Secrest was proceeding alone in a State Police cruiser heading northward along Route 1 in Danvers, Massachusetts. Trooper Secrest observed a vehicle weaving over the marked lanes of Route 1. This lane violation was more than a technicality. The vehicle, an Oldsmobile station wagon with New York license plates, crossed over the solid line and into the “break down” lane on the right side of Route 1 and then proceeded to weave across the dotted line on the left hand side of their lane of travel and into the so-called “passing lane.” Thereafter, the vehicle weaved back into the right hand lane of travel. Upon seeing this, Trooper Secrest activated her emergency lights and began the process of pulling over the Oldsmobile. As she was pulling over the Oldsmobile, she observed two individuals in the front seat of the car. As the lights were activated, she observed the operator look towards the passenger and the passenger look toward the operator. She assumed that this activity of the two occupants looking at each other was consistent with the driver passing the passenger some object. Thereafter, she observed the passenger bending forward to the glove compartment area. She assumed that this gesture was consistent with the passenger concealing some object.
The operator of the Oldsmobile pulled the car over and in a prompt fashion. The Trooper then exited her vehicle, without calling for any back-up, and approached the operator. The operator was an individual in the name of Juan Reyes. The Trooper asked for the operator’s license and registration. Juan Reyes thereupon handed Trooper Secrest a license from Puerto Rico. Trooper Secrest was unsure whether a Puerto *566 Rican license was valid in Massachusetts. She was aware, however, that the Massachusetts State Police computer would not be able to determine the validity of a license issued in Puerto Rico. The passenger, the defendant Wilberto Rivera, then upon request passed the car’s registration to the Trooper. The Trooper does not recall from where defendant Rivera obtained the registration. The registration was facially valid and listed defendant Rivera’s name on the registration. The registration, just as the plates on the car, was issued by the State of New York. Defendant Rivera also passed his license to the Trooper. The license was a New York license bearing his name. Although Trooper Secrest had not yet had an opportunity to check the validity of the registration or the New York license, both appeared facially valid.
Trooper Secrest then asked the operator, Juan Reyes, his destination. He responded that they were in route to Lynn, Massachusetts. The Trooper asked how long they were staying in Lynn and Mr. Reyes responded one night and offered the information that he was coming to Lynn to visit a girlfriend and that he and Rivera were looking for a hotel to stay in the night before they visited the girlfriend in Lynn. Trooper Secrest understandably found this explanation suspicious. Given her knowledge of the Route 1 area she knew that this vehicle had already passed three or four motels along Route 1 before being stopped. Indeed she had observed this vehicle pass the Marriot Residence Inn shortly prior to the lane violation. She also recognized that this vehicle was heading north and away from the City of Lynn. More important, she had observed that the station wagon contained absolutely no luggage of any kind. She understandably was dubious that two individuals, who were allegedly from New York and searching for a hotel did not carry any luggage whatsoever.
All the conversation up to this point had been in English. The driver, Juan Reyes, was fluent in English and the passenger, defendant Rivera, responded to Trooper Secrest’s English questions in English and evidenced no difficulty in understanding her questions. As soon as Mr. Reyes provided this suspicious stoiy about looking for a motel, he began to speak to Rivera in Spanish and Rivera responded in Spanish. Trooper Secrest did not speak Spanish and could not understand this conversation. Thereupon, Trooper Secrest ordered the driver, Juan Reyes, to get out of the vehicle. At this time, Trooper Secrest had not radioed for back-up or had time to run the license or registration. Trooper Secret’s reason for requesting the driver to get out of the vehicle was to pat frisk the driver for weapons. At this point, she had the subjective belief that her personal safety was at risk and that the occupants of the vehicle might be armed. The driver of the vehicle complied and Mr. Reyes was patted down and frisked while standing at the back of the Oldsmobile. As he was being frisked, a Police Officer from the Town of Middleton stopped to offer assistance. The frisk did not reveal any weapons but did reveal a large bulge in the front pants pocket. This large bulge turned out to be $460.00 of cash. Thereupon, Trooper Secrest requested that the passenger, defendant Rivera, to get out of the vehicle. He complied. He was also pat frisked for weapons and none were found.
The Trooper then asked both defendant Rivera and Juan Reyes whether they would mind if she searched the vehicle. She did not inform the two men of their right to refuse to consent to such a search. First Mr. Reyes responded in the words to the effect “no, go ahead." Thereafter Rivera responded in the same fashion. Defendant Rivera evidenced no difficulty understanding Trooper Secrest’s question and he responded in English. Defendant Rivera responded to a number of Trooper Secrest’s questions in English both during the stop and later during the booking procedure at the State Police barracks. Defendant Rivera’s command in the English language is not as great as that of the car’s driver Juan Reyes. On occasion, Mr. Reyes acted as an interpreter for Trooper Secrest when certain questions were asked of defendant Rivera. Mr. Reyes, however, did not attempt to interpret the trooper’s request for permission to search the vehicle. Instead, Mr. Reyes responded that he had no objection and Mr. Rivera, who evidenced substantial comprehension of English, responded without difficulty that he had no objection to the search.
Trooper Secrest began to search the vehicle. She began her search at the glove compartment. This is the same location where she saw the defendant Rivera gestures toward once she activated her lights. Upon looking into the glove compartment she observed a hole approximately the size of a quarter in the back of the glove compartment. Through this hole she could observe a wad of currency. Upon removing the glove compartment, she (now with the aid of another State Trooper who arrived upon the scene) found a substantial amount of money and a quantity of cocaine wrapped in tin foil.
Mr. Reyes and defendant Rivera were then arrested and subsequently booked at the State Police barracks.
DISCUSSION
Although it is a close question, upon weighing all the evidence I conclude that the pat frisk was not valid and that the consent which was obtained almost immediately at the conclusion of the pat frisk was likewise invalid. This Court reaches this conclusion with some hesitation because Trooper Secrest was a completely credible witness. It is, of course, easy to make legal determinations regarding reasonable and articulable suspicions in the security of a courtroom and with the luxury of time for reflection. The pressure is much greater upon a police officer who has the duty is to stop vehicles for significant traffic infractions in the middle of the night and make legitimate threshold inquires. This is indeed challenging and dangerous *567 work. Tragically, recent Massachusetts history has confirmed Justice Harlan’s classic observation that, in such situations, “the answer may be a bullet.”
Cases such as this are subjected to a two-prong analysis: “The first-prong examines whether the initiation of the investigation was permissible in the circumstances, and then, the second-prong examines whether the scope of the search was justified by the circumstances.” Commonwealth v. Owens, 414 Mass. 595, 598-99 (1993). Here there is little doubt that the trooper had a sufficient basis to stop the vehicle. The trooper herself witnessed a significant traffic infraction and, thus, had sufficient reason to pull the vehicle over and make an initial inquiry.
Turning to the second-prong, ie. the scope of the inquiry or search, presents a significantly more difficult issue. “If the reasonably prudent police officer believes his [or her] safety or the public’s safely is in danger, regardless of probable cause to arrest, he is warranted in conducting a search to discover weapons or other hidden instruments that could be used for assault.” Id. at 600. In this case, Trooper Secrest interrogated the occupants of the vehicle before ordering them out of the car. Generally, in the absence of some specific or articulable facts which would permit further inquiry or detention, “once the [occupants] have produced a valid license and registration, there is no basis for further interrogation . . . .” Commonwealth v. Ferrara, 376 Mass. 502, 505 (1978). In the present case, the occupants produced licenses which were, at least, valid on their face. In addition, the defendant produced a license in his name and registration in his name both from the State of New York. The state of the registration coincided with the vehicle’s license plate. See Commonwealth v. Kimball, 37 Mass. App. 604, 607 (1994). Trooper Secrest certainly would have been justified in checking the validity of the licenses and registration, but she did not do so. Instead, she ordered the occupants out of the car and subjected them to a pat and frisk.
There were no specific and articulable facts, or any specific reasonable inferences which follow from such facts, that would justify the pat and frisk. It is true that the trooper observed the occupants of the vehicle look at each other once she activated her blue lights on the cruiser. Although Trooper Secrest stated that she believed that this activity was consistent with passing something from the driver to the passenger, it is (at least) equally consistent with two occupants of a car glancing at each other once they recognize that a police car has activated its lights and is about to pull over the vehicle. Such an exchange of looks, in and of itself, is perfectfully understandable behavior and can hardly be termed a “furtive” gesture. Likewise, the passenger leaning forward to the glove box area was just as consistent with an individual obtaining a registration from the glove box as it would be attempting to conceal an object in the glove box. This is particularly true in light of the fact that Trooper Secrest could not remember where the defendant obtained the registration from when it was produced to the trooper. If the defendant already possessed the registration and simply handed it to the Trooper, the forward gesture toward the glove box was entirely consistent with obtaining the registration. If, on the other hand, the defendant did not already possess the registration, but had to look into the glove box for such a registration in the presence of Trooper Secrest, that fact might have provided a more reasonable basis for suspicion given that the earlier gesture plainly would not have been made to obtain the registration.
It is true that, upon inquiry, the occupants of the vehicle came up with a story that a reasonable police officer might seriously doubt. Why two men would be visiting a girlfriend in Lynn but heading well north of Lynn allegedly searching for a hotel room (having already passed various possible lodgings) without any luggage in the car, would indeed raise some suspicion in a reasonable police officer. Likewise, the occupants changing of languages upon giving the suspicious story might further support the belief that the occupants were lying.[1] These, frankly, are the two facts that makes this case a close call. Nevertheless, even if Trooper Secrest was reasonable in disbelieving this story provided by the defendant and his cohort, it did not provide a reasonable and articulable basis to believe that the defendants had committed some crime, or were about to commit some crime, or were armed and dangerous. Thus, there does not appear to be a sufficient basis to justify the trooper’s order that the occupants step out of the car and submit to a pat frisk. See Commonwealth v. Laughlin, 385 Mass. 60, 62 (1982) (no sufficient basis for pat and frisk even when defendant sitting in driver’s seat of a car which was stopped on the side of the highway and, then, “quickly ducked out of sight” and then “jumped from vehicle and came rapidly toward the Trooper" and where other occupant refused to give any identification other than name and address; once valid license and registration were produced “any justifiable investigation was complete”). See also Commonwealth v. Kimball, supra at 606-07.
The later consent is not automatically invalidated by the invalid pat frisk. Still the invalid pad frisk is an important factor to consider. The consent that was obtained from the driver and the defendant occurred directly after the pat down and while the occupants were still outside of their vehicle and in the presence of the State Trooper and a Police Officer from the Town of Middleton. Given that no significant amount of time elapsed between the invalid pat frisk and the request for consent, and the further fact that the trooper did not advise the defendant of his right to refuse to consent to the search, the taint of the illegal pat frisk was not dissipated and the consent cannot be considered an act of free will on the part of the defendant or *568 the driver. This is true, even though I find that both occupants fully understood Trooper Secrest when she asked if they had any objection to her search and did knowingly respond that he did not have any objection. See Commonwealth v. Laughlin, 385 Mass. at 63.
Therefore, the items obtained in the pat frisk and search of the automobile must be suppressed. The defendant also requests that any of his statements made during the initial inquiry be suppressed. That is denied due to the fact that the initial stop was valid as well as the initial inquiiy. There was no evidence admitted at the hearing regarding any additional evidence obtained by the police subsequent to the search, therefore this Court does not rule on those issues.
The motion is suppress is granted to the extent that all items seized from the vehicle or as a result of the pat frisk are suppressed.

Of course, there is nothing suspicious or furtive when two automobile occupants speak to each other in Spanish. Nor is it even surprising in this case, given that Cruz possessed a license from Puerto Rico. Still, the point here is the sudden switch of languages and the timing of the switch. This is true whether the language was Spanish, Russian, or pig Latin.